## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| ADVOCARE INTERNATIONAL, LLC and CERPUR PIONEER, LLC, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | C.A. NO.: |
| YOUNGMI X. LEE a/k/a YOUNG LEE, YOUNG B. PARK a/k/a YOUNG JOO PARK, LAUREN YU WON KIM, MIA KIM, IAN KIM a/k/a IN GWEON KIM, KUK WHAN KANG, NOSOON KOOK, JIN HWANG a/k/a JINNIE HWANG, JIN LEE a/k/a JINREE LEE, TAE LEE a/k/a TAEJOON LEE, DO LEE, CHRISTI KANG, KIL SUN CHOE a/k/a KIL CHOE, MI LEE a/k/a MI HWA LEE, KWANG SEOK LEE, BENJAMIN KIM a/k/a BEN KIM, and EUNSEOK KIM, natural persons, TRADE VALUE CORPORATION, a Washington corporation, EVERDEALS INC, an Oregon corporation, BLOOMINGLE CO., a Washington corporation, DOROTHY LEE INC., a Washington corporation, ONE ETRADE PLUG INC, a Washington corporation, EDAYS, LLC, a Washington limited liability company, and JOHN DOES 1-10, individually or as corporations/business entities, | § § § § § § § § § § § § § § § § § § § § § § § | DEMAND FOR JURY TRIAL |
| Defendants. | § | |

## COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 U.S.C. § 1114, 15 U.S.C. § 1125(a), AND RELATED CLAIMS

Plaintiffs AdvoCare International, LLC and CERPUR Pioneer, LLC (referenced collectively as "AdvoCare" or "Plaintiffs") bring this action against Defendants Youngmi X. Lee a/k/a Young Lee, Young B. Park a/k/a Young Joo Park, Lauren Yu Won Kim, Mia Kim, Ian Kim

a/k/a In Gweon Kim, Kuk Whan Kang, Nosoon Kook, Jin Hwang a/k/a Jinnie Hwang, Jin Lee a/k/a Jinree Lee, Tae Lee a/k/a Taejoon Lee, Do Lee, Christi Kang, Kil Sun Choe a/k/a Kil Choe, Mi Lee a/k/a Mi Hwa Lee, Kwang Seok Lee, Benjamin Kim a/k/a Ben Kim, Eunseok Kim, Trade Value Corporation, Everdeals Inc, Bloomingle Co., Dorothy Lee Inc., One Etrade Plug Inc, Edays, LLC, and John Does 1-10 (collectively, "Defendants") for: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125; (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (3) trademark infringement and unfair competition under Texas common law; and (4) tortious interference with existing contracts and business relationships. These claims arise from Defendants' misappropriation of AdvoCare's trademarks in connection with Defendants' unlawful sale on the Internet of materially different and non-genuine products bearing AdvoCare's trademarks to unwitting customers. In support of its complaint, AdvoCare alleges as follows:

## PARTIES

1.    AdvoCare International, LLC is a limited liability company, organized under the laws of Delaware, with its principal place of business located in Richardson, Texas.

2.    CERPUR Pioneer, LLC is a limited liability company, organized under the laws of Delaware, with its principal place of business located in Richardson, Texas.

3.    Multiple defendants are acting in concert as part of a coordinated scheme to unlawfully sell products bearing AdvoCare's trademarks through multiple online storefronts. These defendants consist of: (1) seventeen individuals who AdvoCare believes are all related to one another and/or friends (the "Individual Defendants"); and (2) six corporations organized under Washington and Oregon law that are controlled by the Individual Defendants and used as a vehicle by the Individual Defendants to sell products on the Internet (the "Entity Defendants").

4.    As discussed in more detail below, virtually all of the Individual Defendants entered into contracts with AdvoCare to purchase products from AdvoCare and structured their accounts so that one or more Individual Defendants earned bonuses and commissions when other Individual Defendants purchased products.  The Individual Defendants then sold products through prohibited websites and continued obtaining and reselling products bearing AdvoCare's trademarks after their contracts with AdvoCare were terminated.  The Individual Defendants have taken numerous steps to conceal their sales, including listing false information on their online storefronts and hiding their identities behind sham companies they organized—the Entity Defendants—to act as the purported "operators" of their online storefronts.

5.    Youngmi X. Lee a/k/a Young Lee ("Young Lee") is a natural person who, upon information and belief, resides at 7117 Spencer Avenue NE, Olympia, WA 98516 and may be served process therein or wherever Younf Lee may be found.  Young Lee operates or has assisted in the operation of at least eleven online storefronts on www.amazon.com ("Amazon") and has used the storefronts to sell infringing products bearing AdvoCare's trademarks throughout the United States, including in Texas.  The following table identifies the eleven known Amazon storefronts ("Amazon Storefronts") that Young Lee has operated:

| Current Name of Storefront | Access Link with Amazon "Merchant ID" |
|---|---|
| "Dreamtrade" | https://www.amazon.com//sp?seller=A1MWYO9R0WSUHA |
| "HeGrace" | https://www.amazon.com//sp?seller=A163468CCGF0Q7 |
| "Good Products One" | https://www.amazon.com//sp?seller=AYIU3P171RV6J |
| "everdeals4u" | https://www.amazon.com//sp?seller=A1FQ9UABKHYZFT |
| "Illuminate" | https://www.amazon.com//sp?seller=A2R53PFK6NAZOM |
| "Best4living" | https://www.amazon.com//sp?seller=A2UWD6WE15R4LW |

| "BLUEJAY05" | https://www.amazon.com//sp?seller=A1I77UV73TUUTJ |
| "Progressive Fresh Health" | https://www.amazon.com//sp?seller=A3QONIZYSPHDTV |
| "Green365" | https://www.amazon.com//sp?seller=A1NTXYEZNYX0W3 |
| "forestNstreet" | https://www.amazon.com//sp?seller=A3DNZ7AVGC8D8Z |
| "COSMOLINK^^" | https://www.amazon.com//sp?seller=A3AH2KP6DTFC7G |

6.      Young B. Park a/k/a Young Joo Park ("Young Park") is a natural person who, upon information and belief, resides at 7117 Spencer Avenue NE, Olympia, WA 98516 and may be served with process therein or wherever Young Park may be found.  Young Park assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

7.      Lauren Yu Won Kim ("Lauren Kim") is a natural person who, upon information and belief, resides at 4825 SW 141st Avenue, Beaverton, OR 97005 and may be served with process therein or wherever Lauren Kim may be found.  Lauren Kim assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

8.      Mia Kim is a natural person who, upon information and belief, resides at 4405 Vista Pointe Drive, Medford, OR 97504 and may be served with process therein or wherever Mia Kim may be found.  Mia Kim assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

9.      Ian Kim a/k/a In Gweon Kim ("Ian Kim") is a natural person who, upon information and belief, resides at 4405 Vista Pointe Drive, Medford, OR 97504 and may be served with process therein or wherever Ian Kim may be found.  Ian Kim assists in the operation of the Amazon

Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

10.     Kuk Whan Kang ("Kuk Kang") is a natural person who, upon information and belief, resides at 5708 238th Street SW, Mountlake Terrace, WA 98043 and may be served with process therein or wherever Kuk Kang may be found.  Kuk Kang assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

11.     Nosoon Kook is a natural person who, upon information and belief, resides at 3503 Juanpiero Way, #5, Medford, OR 97504 and may be served with process therein or wherever Nosoon Kook may be found.  Nosoon Kook assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

12.     Jin Hwang a/k/a Jinnie Hwang ("Jin Hwang") is a natural person who, upon information and belief, resides at 7521 Columbia Way NE, Federal Way, WA 98023 and may be served with process therein or wherever Jin Hwang may be found.  Jin Hwang assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

13.     Jin Lee a/k/a Jinree Lee ("Jin Lee") is a natural person who, upon information and belief, resides at 2817 11th Street SE, Puyallup, WA 98374 and may be served with process therein or wherever Jin Lee may be found.  Jin Lee assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

14.     Tae Lee a/k/a Taejoon Lee ("Tae Lee") is a natural person who, upon information and belief, resides at 2817 11th Street SE, Puyallup, WA 98374 and may be served with process therein or wherever Tae Lee may be found.  Tae Lee assists in the operation of the Amazon

Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

15.     Do Lee is a natural person who, upon information and belief, resides at 33637 25th Place SW, #F1, Federal Way, WA 98023 and may be served with process therein or wherever Do Lee may be found.  Do Lee assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

16.     Christi Kang is a natural person who, upon information and belief, resides at 5708 238th Street SW, Mountlake Terrace, WA 98043 and may be served with process therein or wherever Christi Kang may be found.  Christi Kang assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

17.     Kil Sun Choe a/k/a Kil Choe ("Kil Choe") is a natural person who, upon information and belief, resides at 18501 52nd Avenue W, #14, Lynwood, WA 98037 and may be served with process therein or wherever Kil Choe may be found.  Kil Choe assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

18.     Mi Lee a/k/a Mi Hwa Lee ("Mi Lee") is a natural person who, upon information and belief, resides at 26705 19th Avenue S, Des Moines, WA 98198 and may be served with process therein or wherever Mi Lee may be found.  Mi Lee assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

19.     Kwang Seok Lee is a natural person who, upon information and belief, resides at 26705 19th Avenue S, Des Moines, WA 98198 and may be served with process therein or wherever

Kwang Seok Lee may be found.  Kwang Seok Lee assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

20.     Benjamin Kim a/k/a Ben Kim ("Benjamin Kim") is a natural person who, upon information and belief, resides at 11336 SW Bull Mountain Road, #103, Portland, OR 97224 and may be served with process therein or wherever Benjamin Kim may be found.  Benjamim Kim assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

21.     Eunseok Kim is a natural person who, upon information and belief, resides at 12580 Eagles Nest Drive, Mukilteo, WA 98275 and may be served with process therein or wherever Eunseok Kim may be found.  Eunseok Kim assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

22.     Trade Value Corporation is a corporation organized under the laws of Washington. According to corporate documents filed with the Washington Secretary of State, the principal place of business of Trade Value Corporation is located at 5708 238th Street SW, Mountlake Terrace, WA 98043.  Corporate documents also provide that Trade Value Corporation's registered agent is Kuk Whan Kang and that Trade Value Corporation may be served with process upon its registered agent at 5708 238th Street SW, Mountlake Terrace, WA 98043.  Trade Value Corporation assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

23.     Everdeals Inc is a corporation organized under the laws of Oregon.  According to corporate documents filed with the Oregon Secretary of State, the principal place of business of Everdeals Inc is located at 4414 S. Pacific Highway, Ste. 8, Phoenix, OR 97535.  Corporate

documents also provide that Everdeals Inc's registered agent is Nosoon Kim and that Everdeals Inc may be served with process upon its registered agent at 4414 S. Pacific Highway, Ste. 8, Phoenix, OR 97535.  Everdeals Inc assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

24.     Bloomingle Co. is a corporation organized under the laws of Washington. According to corporate documents filed with the Washington Secretary of State, the principal place of business of Bloomingle Co. is located at 5016 Fairwood Blvd. NE, #226, Tacoma, WA 98422. Corporate documents also provide that Bloomingle Co.'s registered agent is Tae Lee and that Bloomingle Co. may be served with process upon its registered agent at 5016 Fairwood Blvd. NE, #226, Tacoma, WA 98422.  Bloomingle Co. assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

25.     Dorothy Lee Inc. is a corporation organized under the laws of Washington. According to corporate documents filed with the Washington Secretary of State, the principal place of business of Dorothy Lee Inc.. is located at 11700 Mukilteo Speedway, #201-2050, Mukilteo, WA 98275.  Corporate documents also provide that Dorothy Lee Inc.'s registered agent is Young Lee and that Dorothy Lee Inc. may be served with process upon its registered agent at 11700 Mukilteo Speedway, #201-2050, Mukilteo, WA 98275.   Dorothy Lee Inc. assists in the operation of the Amazon Storefronts and does business throughout the United States through the  Amazon Storefronts, including in Texas.

26.     One Etrade Plug Inc is a corporation organized under the laws of Washington. According to corporate documents filed with the Washington Secretary of State, the principal place of business of One Etrade Plug Inc is located at 7600 196th Street SW, Ste. 200, Lynwood, WA

98036.  Corporate documents also provide that One Etrade Plug Inc's registered agent is Christi Kang and that One Etrade Plug Inc may be served with process upon its registered agent at 7600 196th Street SW, Ste. 200, Lynwood, WA 98036.  One Etrade Plug Inc assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

27.    Edays LLC is a limited liability company organized under the laws of Washington. According to corporate documents filed with the Washington Secretary of State, the principal place of business of Edays LLC is located at 10605 SE 240th Street, Kent, WA 98031.  Corporate documents also provide that Edays LLC's registered agent is Mi Lee and that Edays LLC may be served with process upon its registered agent at 10605 SE 240th Street, Kent, WA 98031.  Edays LLC assists in the operation of the Amazon Storefronts and does business throughout the United States through the Amazon Storefronts, including in Texas.

28.    According to corporate documents that have been filed for the Entity Defendants, some of the Individual Defendants are corporate officers of the Entity Defendants.  AdvoCare asserts claims against these Individual Defendants in both their individual capacities and also in their capacities as corporate officers of the Entity Defendants.  All of the Individual Defendants in their individual capacities and all of the Entity Defendants all separately assist in and are responsible for the operation of and sales of infringing products by the Amazon Storefronts.

29.    Alternatively, the Individual Defendants who are officers of the Entity Defendants are in control of the Entity Defendants, are primarily responsible for the actions of the Entity Defendants, and all direct, control, ratify, participate in, or are the moving force behind the acquisition and sale of infringing products bearing AdvoCare's trademarks by the Entity Defendants.  Upon information and belief, each of the Individual Defendants personally

9

participates in the acquisition and sale of infringing products by the Entity Defendants that they control and the Entity Defendants are sham companies that were created solely for use as a vehicle for the Individual Defendants to sell products online and conceal their identities. Accordingly, the Individual Defendants are all personally liable for all infringing activities that were carried out by the Entity Defendants without regard to piercing the corporate veil.

30.     AdvoCare believes that other individuals or entities may also be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute. The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to AdvoCare. Therefore, AdvoCare sues these Defendants by the fictitious names John Does 1 through 10. When the true names, involvement, and capacities of these parties are ascertained, AdvoCare will seek leave to amend this Complaint accordingly. If AdvoCare does not identify any such parties, it will dismiss these Defendants from this action.

31.     Upon information and belief, the Individual Defendants, Entity Defendants, and John Does 1-10 (referenced collectively as "Defendants") are all acting in concert and are jointly responsible for the conduct complained of herein.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367. AdvoCare's federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a), and its claims arising under the laws of the State of Texas are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

33.     This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of Texas and established sufficient minimum contacts with Texas by, among other things, advertising and selling substantial quantities of infringing products bearing AdvoCare's trademarks to consumers within Texas through a highly interactive commercial website with knowledge that AdvoCare is located in Texas and is harmed in Texas as a result of Defendants' sales of infringing products to Texas residents.  Defendants know that AdvoCare is located in Texas, among other reasons, because they received cease-and-desist letters informing them that AdvoCare is located in Texas and is harmed in Texas by their unlawful actions.  Most of the Individual Defendants also used to be AdvoCare Independent Distributors and knew through their business relationship that AdvoCare is located in Texas.  AdvoCare's claims arise out of Defendants' substantial and regular sales of infringing products bearing AdvoCare's trademarks to Texas residents.

34.     Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to AdvoCare's claims occurred within this judicial district, or in the alternative because a Defendant is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### AdvoCare and Its Trademarks

35.     AdvoCare develops, manufactures, and sells weight management, energy and fitness, and personal care products under various brands, including AdvoCare®, Spark®, and OmegaPlex® (collectively, "AdvoCare products").  These include numerous products that consumers ingest.

36.     To ensure that consumers receive top quality products, AdvoCare allows AdvoCare products to be sold to U.S. consumers only by AdvoCare itself through AdvoCare.com and by sellers who are expressly authorized to sell AdvoCare products.  These sellers include AdvoCare Independent Distributors ("Distributors"), who are independent contractors who are authorized and trained by AdvoCare to market and sell AdvoCare products.

37.     Distributors must enter into contracts with AdvoCare to be permitted to sell AdvoCare products.  These contracts authorize Distributors to sell AdvoCare products only in certain channels and require Distributors to provide various customer services and exercise various quality controls over AdvoCare products.  AdvoCare enforces its quality controls and customer services that it requires Distributors to perform.

38.     AdvoCare devotes a significant amount of time, energy, and resources to protecting the value of its brand, products, name, and reputation.  By distributing AdvoCare products exclusively through its own website and sellers who are required to follow AdvoCare's quality controls, AdvoCare ensures the safety, well-being, and satisfaction of consumers and maintains the integrity and reputation of the AdvoCare family of brands.  In the highly competitive nutrition market, product quality and customer service are a fundamental part of a consumer's decision to purchase a product.

39.     To promote and protect its intellectual property rights, AdvoCare has registered numerous trademarks with the United States Patent and Trademark Office.  These trademarks include, but are not limited to: ADVOCARE® (U.S. Trademark Registration Nos. 4,898,774, 4,855,740, and 1,959,765), 24 DAY CHALLENGE® (U.S. Trademark Registration No. 4,815,953), WE BUILD CHAMPIONS® (U.S. Trademark Registration No. 4,551,065), ADVOCARE SPARK® (U.S. Trademark Registration No. 3,303,370), MNS® (U.S. Trademark

Registration No. 4,587,566), SPARK® (U.S. Trademark Registration Nos. 4,883,888 and 5,354,964), and OMEGAPLEX® (U.S. Trademark Registration No. 2,227,261) (collectively, the "AdvoCare Trademarks").

40.     The registration for each of the AdvoCare Trademarks is valid, subsisting, and in full force and effect.

41.     Further, AdvoCare's rights to use many of the AdvoCare Trademarks have become incontestable under 15 U.S.C. § 1065 because the trademarks have been in continuous use, AdvoCare received no final legal decision issued against the trademarks, and AdvoCare timely filed a Section 15 Declaration describing the trademarks' use.  Accordingly, these trademarks serve as conclusive evidence of AdvoCare's ownership of the marks and of AdvoCare's exclusive right to use and direct the use of the marks in commerce and in connection with the sale and distribution of products bearing the marks identified in the registrations, as provided by 15 U.S.C. § 1115(b).

42.     AdvoCare actively uses and markets the AdvoCare Trademarks in commerce.

43.     Due to the quality and exclusive distribution of AdvoCare products, and because AdvoCare is recognized as the source of high quality products, the AdvoCare Trademarks have substantial value.

### Online Marketplaces and the Threat They Pose to AdvoCare's Quality Controls, Reputation, and Goodwill

44.     E-commerce retail sales have exploded over the past decade.  From 2009 through the end of 2022, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 14.7%.  *E-Commerce Retail Sales as a Percent of Total Sales*, Federal Reserve Bank of St. Louis (February 17, 2023), https://fred.stlouisfed.org/series/ECOMPCTSA.

45.     In 2022 consumers spent $1.03 trillion on e-commerce sales, a 7.7% increase from 2021.  *See* Paul Conley, *U.S. ecommerce in 2022 tops $1 trillion for first time*, Digital Commerce 360 (February 17, 2023), https://www.digitalcommerce360.com/article/us-ecommerce-sales/. The massive growth in e-commerce is being driven largely by sales on online marketplaces.  For example, in 2021 United States consumers spent more than $378 billion in e-commerce sales on Amazon, which was an 18.8% increase from 2020 and 43.5% of total e-commerce sales in 2021.

46.     Although online marketplaces are becoming increasingly popular among consumers, they also greatly challenge a manufacturer's ability to control the quality and safety of its products.

47.     Unlike when purchasing products at brick-and-mortar stores or in interpersonal transactions, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the manufacturer.

48.     Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a manufacturer's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the manufacturer's controls.

49.     Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) manufacturers who exercise quality controls over their products sold by authorized sellers.  It is unfortunately common for unauthorized sellers to sell diverted products

on online marketplaces that are of lesser quality than products sold through manufacturers' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016,  https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.  *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

50.    The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that unauthorized sellers are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016,  https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019, https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/.

51.    The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-

commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms.  The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online.  *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

52.    In its 2018, 2019, 2020, 2021, and 2022 annual reports to its shareholders, Amazon acknowledged that third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers.  *See, e.g.,* Amazon.com, Inc., Annual Report (Form 10-K), at 8 (Feb. 2, 2023), *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/336d8745-ea82-40a5-9acc-1a89df23d0f3.pdf  Amazon conceded that these actions are "violating the proprietary rights of others" and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

53.    Because manufacturers have no relationship with or control over unauthorized sellers, manufacturers have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A manufacturer's inability to exercise control over the quality of its products presents serious risks to the health and safety of consumers—particularly when, as here, a manufacturer's products are ingested by consumers.

54.    The structure, construction, and user interface of online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

55.    When purchasing products on an online marketplace, customers are ordinarily not informed whether a seller of a product is authorized by the manufacturer.  Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the manufacturer when they purchase an online marketplace or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval.  Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "Brand [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the manufacturer.

56.    For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.

57.    When a customer purchases on a marketplace and receives a product that is damaged, defective, expired, soon-to-expire, counterfeit, or of otherwise poor quality, the customer is much more likely to associate that frustration with the brand/manufacturer than the product seller.

58.    Online marketplaces also give disgruntled consumers a powerful and convenient forum to air their grievances about disappointing products: online product reviews.  Any consumer who is dissatisfied with a product received can post a review on the marketplace for all other

consumers to see.  These reviews, which often remain permanently attached to products, will often criticize the product manufacturer rather than the marketplace seller that sold the product.

59.    Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, Online reviews, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

60.    Studies and surveys consistently show that consumers place extraordinary trust in online product reviews.  For instance, research has shown that 49 % of online consumers now trust online reviews as much as personal recommendations from friends and family.  Jamie Pitman, *Local    Consumer    Review    Survey    2022*,    BRIGHTLOCAL, https://www.brightlocal.com/research/local-consumer-review-survey/.    Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, FTC cracking down on fake Amazon reviews, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

61.    Consumers also pay special attention to negative online reviews of products because negative reviews are generally outnumbered by positive reviews and consumers believe negative reviews are particularly trustworthy due to their scarcity.  *See* Caroline Beaton, *Why You Can't Really Trust Negative Online Reviews*, THE NEW YORK TIMES, June 13, 2018 https://www.nytimes.com/2018/06/13/smarter-living/trust-negative-product-reviews.html.  According to one study, 85% consumers will intentionally seek out negative reviews when

shopping online.  Faith Hinz, *The Growing Power of Reviews*, POWERREVIEWS, 2018, https://www.powerreviews.com/wp-content/uploads/2018/03/The-Growing-Power-of-Reviews.pdf.  As a result, brands are especially harmed when consumers leave negative product reviews after purchasing from an unauthorized seller because the reviews will be widely viewed and deemed to be particularly accurate in describing a product's quality.

62.    Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's reputation and goodwill.

**AdvoCare's Reputation and Goodwill Have Been Harmed By
Numerous Online Reviews Written By Consumers Who Purchased
Poor Quality Products from Unauthorized Sellers On Online Marketplaces**

63.    Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor quality products or customer service and leave negative reviews on product listings.  These negative reviews injure consumer perceptions of a brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

64.    Numerous consumers have written negative reviews of AdvoCare products being offered for sale on online marketplaces.  In these reviews, many of which appear on listings of products that have been offered for sale by Defendants, consumers have given misappropriated AdvoCare products low "ratings" and complained of receiving products that were expired, previously used, tampered with, missing contents, damaged, allegedly counterfeit, and different in substance, taste, and quality from AdvoCare products consumers had previously purchased from other sources.

65.    For example, Defendants have sold on Amazon the AdvoCare product seen in the screenshot below:



66.     As seen in the following sample screenshots of customer reviews, numerous consumers have left negative reviews of this product complaining of receiving products that were not sealed, tampered with, previously used, missing contents, very old, damaged, and much worse in quality than AdvoCare products consumers had previously purchased from other sources:







 Schmellymel
★☆☆☆☆ **Old or Expired**
Reviewed in the United States us on October 4, 2022
Flavor Name: Fruit Punch | Size: 0.25 Ounce (Pack of 14) | Verified Purchase

These are not Spark. They are all clumped together, there's powder stuck on the packets outside they all stick together and look like they're expired. It does t taste the same at all. They're awful.



 Bianca

★☆☆☆☆ **Spilled everywhere. Package arrived damaged**
Reviewed in the United States us on August 26, 2022
Flavor Name: Fruit Punch | Size: 10.5 Ounce (Pack of 1) | Verified Purchase

Was looking forward to trying this out but unfortunately came damaged



 Gigi
★☆☆☆☆ **I feel like it's been tampered with**
Reviewed in the United States us on March 21, 2020
Flavor Name: Mandarin Orange | Size: 10.5 Ounce (Pack of 1) | Verified Purchase

I just opened my container of spark it looks like it was halfway full so I counted how many scoops, the label says 42 but I got 30

5 people found this helpful

 Elizabeth Dickey

★☆☆☆☆ **Opened when I received it!!**
Reviewed in the United States us on February 13, 2020
Flavor Name: Fruit Punch | Size: 10.5 Ounce (Pack of 1) | Verified Purchase

Was open when I received it!!! Now I'm scared to even use it!! Very disappointed

 Melissa
★☆☆☆☆ **No seal on canister**
Reviewed in the United States us on March 8, 2019
Flavor Name: Fruit Punch | Size: 10.5 Ounce (Pack of 1) | Verified Purchase

This product came without the white seal under the cap and the outer seal looked worn. I wasn't sure if they had usually had the white seal until I received my order directly from Advocare today....I am questioning the contents.

 Schmellymel
★☆☆☆☆ **False product**
Reviewed in the United States us on June 8, 2021
Flavor Name: Fruit Punch | Size: 10.5 Ounce (Pack of 1) | Verified Purchase

I don't believe this was the original product it literally felt like nothing there was no boost in energy or anything and I have in the past absolutely tried it the flavor was there but it was not the same







67.    Below is a screenshot of another AdvoCare product that Defendants have sold on Amazon:





68.    As seen in the following sample screenshots of customer reviews, numerous consumers have left negative reviews of this product complaining of receiving products that were damaged, tampered with, missing contents, and fake:



**Amazon Customer**

★☆☆☆☆ **Safety**

Reviewed in the United States us on January 2, 2022

Ok so my son is dealing with not being able to focus at school , someone Reccomended this but when I received it it was not properly sealed and the powder was everywhere. Then when I actually opened it all the way was only half of it. Like really? I paid over $70 for this crap?

It's super sweet, I'm not so sure if we should try it or not after all.



**Stacy**

★☆☆☆☆ **Product ruined upon delivery**

Reviewed in the United States us on May 15, 2020

**Verified Purchase**

The container was busted upon arrival and powder was everywhere. So disappointed.



**Kristy**

★★☆☆☆ **Half full**

Reviewed in the United States us on August 4, 2020

**Verified Purchase**

Canister was sealed but I felt like I had a bag of chips, was only half full. Really insulting to pay that price for half quantity.



**Mel Schanz**

★☆☆☆☆ **Not the Real Spark**

Reviewed in the United States us on August 14, 2019

**Verified Purchase**

This is not the same as Advocar Spark. Also, the container was only half full when I received it which makes the overall price more per ounce than buying from Advocare.



**Tom K Amazon Customer**

★★☆☆☆ **Fake product.**

Reviewed in the United States us on February 19, 2019

**Verified Purchase**

I've bought spark for years. I think this batch is 25% spark, the rest koolaid. I do not feel the rush and it doesnt taste the same.

69.     The foregoing reviews are only a sample of the numerous negative reviews of the products depicted above and of other AdvoCare products listed on the Amazon website that Defendants have sold through their Amazon Storefronts.

70.     Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review.  Given that Defendants have sold an extremely high volume of products bearing the AdvoCare Trademarks on Amazon and are not subject to AdvoCare's quality controls, however, it is exceedingly likely that some of the foregoing negative

reviews—and the many other similar negative reviews of AdvoCare products that Defendants have sold on Amazon—were written by customers who purchased products bearing the AdvoCare Trademarks from Defendants.

**AdvoCare Exercises Strict Quality Controls  Over the Production and Distribution of Its Products and Provides a Satisfaction Guarantee for Products Purchased from Distributors**

71.    To maintain quality controls over AdvoCare products, AdvoCare allows AdvoCare products to be sold in the United States only by AdvoCare itself (through AdvoCare.com) and by sellers who are expressly authorized to sell AdvoCare products.

72.    AdvoCare Independent Distributors are required by contract to sell products only in certain channels and to abide by AdvoCare's Distributor Agreement and Policies, Procedures, and Compensation Plan (collectively, the "AdvoCare Rules"). AdvoCare enforces the quality controls and other rules that Distributors are required to follow pursuant to their contracts with AdvoCare.

73.    Because of the threats to its goodwill and consumer safety that are caused by sales on online marketplaces, as discussed above, AdvoCare prohibits Distributors from selling AdvoCare products on the Internet unless they sell through a designated AdvoCare Distributor Website.  AdvoCare strictly prohibits Distributors from selling AdvoCare products on any online marketplace, including Amazon.

74.    AdvoCare also prohibits Distributors from selling products through certain other channels, including retail and service establishments, with very limited and strict exceptions. AdvoCare prohibits virtually all sales through these channels to encourage Distributors to display and sell products in interpersonal transactions where Distributors provide customers with vital information regarding AdvoCare products and their uses.  Through person-to-person interactions,

Distributors are also able to provide explanation and guidance on how to safely and properly use AdvoCare products.

75.    Through its contracts, AdvoCare also requires Distributors to follow quality controls relating to the handling, storage, inspection, and sale of AdvoCare products.  These quality controls allow AdvoCare to maintain the integrity and quality of its products, guarantee that consumers receive undamaged, genuine goods, and ensure that consumers receive products that meet their specific needs.

76.    To ensure that customers receive products of the quality they have come to expect from AdvoCare, Distributors are also prohibited from altering any AdvoCare product, packaging, label, or accompanying literature.  Distributors may sell AdvoCare products only in their original packaging and formulation to prevent customer confusion and erosion in the quality and value of AdvoCare products.

77.    The AdvoCare Rules also require Distributors to provide personal services to customers concurrently with and after their sales of AdvoCare products, including providing advice, answering questions, teaching customers how to use products, and explaining precautions and instructions on proper usage of products.  Distributors have access to literature and other educational materials developed to advise customers on each product's purpose, features, and benefits.  Distributors are thus uniquely qualified to explain best practices for safe and optimal use of AdvoCare products, and Distributors are instructed to present only truthful and accurate information about AdvoCare's products and services.  Distributors are also required to provide their contact information so that customers can contact Distributors with any questions about products or completed product purchases.

78.     It is essential to consumer well-being and AdvoCare's reputation that customers are able to make fully informed decisions about whether to purchase AdvoCare products and which products to purchase.  Accordingly, AdvoCare closely monitors its Distributors to ensure that the information provided to customers is truthful and accurate, and that statements are not made suggesting that AdvoCare products can be used to diagnose, treat, cure, or prevent illnesses, diseases, or medical conditions.

79.     AdvoCare also prohibits Distributors from selling AdvoCare products to persons or entities that Distributors know, or reasonably should know, are going to resell the products. Distributors are permitted to sell products only to end-user consumers.  The purpose of these restrictions is to ensure that AdvoCare products are sold to consumers only by AdvoCare itself or by sellers who are subject to and follow AdvoCare's quality controls.

80.     AdvoCare provides a 30-day, complete money-back satisfaction guarantee (the "Satisfaction Guarantee") to consumers who purchase AdvoCare products from Distributors or AdvoCare itself.  Under the Satisfaction Guarantee, a consumer is able to receive a full refund or product exchange if they are not completely satisfied with their product, return the unused portion of their product, and provide proof of purchase.

81.     AdvoCare offers the Satisfaction Guarantee only for products that were sold by sellers who are subject to AdvoCare's quality controls and have agreed to follow its quality controls.  Because non-Distributors are not subject to AdvoCare's quality controls and AdvoCare therefore cannot ensure the quality of products sold by non-Distributors, the Satisfaction Guarantee is not available for AdvoCare products purchased from any third party that is not a Distributor or otherwise subject to AdvoCare's quality controls (including Defendants).

**AdvoCare's Discovery of Defendants' Scheme and Sales of AdvoCare Products**

82.     Because the unauthorized sale of AdvoCare products over the Internet threatens the safety of consumers and the reputation and goodwill associated with the AdvoCare Trademarks, AdvoCare actively monitors the sale of AdvoCare products online.

83.     Through these efforts, AdvoCare discovered that large quantities of products bearing the AdvoCare Trademarks were being unlawfully sold on Amazon through storefronts that are currently called "Dreamtrade," "HeGrace," "Good Products One," "everdeals4u," "Illuminate," "Best4living," "BLUEJAY05," "Progressive Fresh Health," "Green365," "forestNstreet," and "COSMOLINK^^".

84.     Upon information and belief, Defendants jointly operate the Amazon Storefronts and have worked in concert in a coordinated scheme to unlawfully sell products bearing the AdvoCare Trademarks through the storefronts.  Although some Defendants may be more involved than others in operating certain storefronts, all Defendants have acted in concert and are jointly responsible for the conduct complained of herein.

85.     The "Dreamtrade" Amazon storefront has stated that the "Business Name" of the operator of the storefront is "Dorothy Lee Inc."  Through investigation, AdvoCare discovered that there is a corporation organized under Washington law called Dorothy Lee Inc.  Corporate documents that have been filed for Dorothy Lee Inc. identify Young Lee as the sole governor of Dorothy Lee Inc., do not identify any other individuals as officers of Dorothy Lee Inc., and provide that the street address of Dorothy Lee Inc. is 11700 Mukilteo Speedway, #201-2050, Mukilteo, WA 98275 (the "Mukilteo Speedway Address").  The Mukilteo Speedway Address has also been listed on the "Dreamtrade" Amazon storefront as the "Business Address" of the storefront.

86.    Shortly before the time of filing, on or around March 27, 2023, the "Business Name" of the operator of the "Dreamtrade" storefront was changed from "Dorothy Lee Inc." to "Young B. Park."  According to public records databases, Young Park is a relative of Young Lee and currently lives at the same address as Young Lee.

87.    The "HeGrace" Amazon storefront has stated that the "Business Name" of the operator of the storefront is "H Grace Inc."  Through investigation, AdvoCare discovered that there is a corporation organized under Oregon law called H Grace Inc, although the corporation was administratively dissolved on or around October 13, 2022.  The articles of incorporation that were filed for H Grace Inc on or around August 12, 2020 identified Mia Kim as the president and secretary of H Grace Inc.  Subsequently-filed corporate documents identified Lauren Kim instead of Mia Kim as the president and secretary of H Grace Inc and did not identify any individuals except for Mia Kim and Lauren Kim as officers of H Grace Inc.  Corporate documents provided that the street address of H Grace Inc was 4825 SW 141st Avenue, Beaverton, OR 97005 (the "141st Avenue Address"), and the 141st Avenue Address is also listed on the "H Grace Inc" Amazon storefront as the "Business Address" of the storefront.

88.    A product purchase from the "HeGrace" storefront also resulted in a product being shipped that listed "I G Kim" on the return address label.  Upon information and belief, and based on the return address information that appeared on the address label, the "I G Kim" who shipped the product was Ian Kim.

89.    The "Good Products One" Amazon storefront has stated that the "Business Name" of the operator of the storefront is "Trade Value Corporation."  Through investigation, AdvoCare discovered that there is a corporation organized under Washington law called Trade Value Corporation.  Corporate documents that have been filed for Trade Value Corporation identify Kuk

Kang as the sole governor of Trade Value Corporation, do not identify any other individuals as officers of Trade Value Corporation, and provide that the street address of Trade Value Corporation is 5708 238th Street SW, Mountlake Terrace, WA 98043 (the "238th Street Address"). The 238th Street Address has also been listed on the "Good Products One" Amazon storefront as the "Business Address" of the storefront. In addition, a product purchase from the "Good Products One" storefront resulted in a product being shipped that listed Kuk Kang on the return address label.

90.     The "everdeals4u" Amazon storefront has stated that the "Business Name" of the operator of the storefront is "EVERDEALS INC." Through investigation, AdvoCare discovered that there is a corporation organized under Oregon law called Everdeals Inc. Corporate documents that have been filed for Everdeals Inc identify Nosoon Kook as the president and secretary of Everdeals Inc, do not identify any other individuals as officers of Everdeals Inc, and provide that the street address of Everdeals Inc is 4414 S. Pacific Highway, Ste. 10, Phoenix, OR 97535 (the "Pacific Highway Address"). The Pacific Highway Address has also been listed on the "everdeals4u" Amazon storefront as the "Business Address" of the storefront.

91.     The "Illuminate" Amazon storefront has stated that the "Business Name" of the operator of the storefront is "Ia K" and lists an address in Osan, South Korea as the address of "Ia K." However, a product purchase from the "Illuminate" storefront resulted in a product being delivered that, according to codes on the product, had previously been sold to Jin Hwang. The AdvoCare products that the "Illuminate" storefront has listed for sale were also manufactured in and intended for sale in the United States, not South Korea, and there is no indication that the products ever left the United States or are being sold by a seller located overseas. Accordingly, upon information and belief and based on its investigation, AdvoCare believes that the "Business

Name" that has appeared on the "Illuminate" storefront is false and the storefront is actually owned and controlled by Jin Hwang and the other Defendants.

92.     The "Best4living" Amazon storefront has stated that the "Business Name" of the operator of the storefront is "BLOOMINGLE CO."  Through investigation, AdvoCare discovered that there is a corporation organized under Washington law called Bloomingle Co.  Corporate documents that have been filed for Bloomingle Co. identify Tae Lee and Jin Lee as the sole governors of Dorothy Lee Inc., do not identify any other individuals as officers of Bloomingle Co., and provide that the mailing address of Bloomingle Co. is 15127 Main Street E #104-431, Sumner, WA 98390 (the "Main Street Address").  The Main Street Address has also been listed on the "Best4Living" Amazon storefront as the "Business Address" of the storefront.

93.     The "BLUEJAY05" Amazon storefront has stated that the "Business Name" of the operator of the storefront is "Do Lee."  The storefront also states that its "Business Address" is 33637 25th Place SW, Apt. F1, Federal Way, WA 98023 (the "25th Place Address").  According to public records databases and AdvoCare's investigation, the 25th Place Address is Do Lee's home address.

94.     The "Progressive Fresh Health" Amazon storefront has stated that the "Business Name" of the operator of the storefront is "One Etrade Plug INC."  Through investigation, AdvoCare discovered that there is a corporation organized under Washington law called One Etrade Plug Inc.  The articles of incorporation that were filed for One Etrade Plug Inc on or around February 22, 2022 identified Kuk Kang as the registered agent and sole officer of One Etrade Plug Inc.  The articles of incorporation also listed 5708 238th Street SW, Mountlake Terrace, WA 98043 (the "238th Street Address") as the street address of One Etrade Plug Inc.  Subsequently-filed corporate documents have identified Christi Kang as the registered agent and sole governor of One

Etrade Plug Inc, have not identified any other individuals as officers of One Etrade Plug Inc, and have provided that the street address of One Etrade Plug Inc is 7600 196th Street SW, Ste. 200, Lynwood, WA 98036 (the "196th Street Address") instead of the 238th Street Address.  The 196th Street Address has been listed on the "Progressive Fresh Health" Amazon storefront as the "Business Address" of the storefront.  According to public records databases and AdvoCare's investigation, the 238th Street Address is the home address of both Christi Kang and Kuk Kang.

95.    The "Green365" Amazon storefront currently states that the "Business Name" of the operator of the storefront is "EDAYS."  Through investigation, AdvoCare discovered that there is a limited liability company organized under Washington law called Edays, LLC.  Corporate documents that have been filed for Edays, LLC identify Mi Lee and Kwang Seok Lee as the sole governors of Edays, LLC, do not identify any other individuals as officers or members of Edays, LLC, and provide that the mailing address of Edays, LLC is 10605 SE 240th Street, Kent, WA 98031 (the "240th Street Address").  The 240th Street Address has been listed on the "Green365" Amazon storefront as the "Business Address" of the storefront.

96.    The "Green365" Amazon storefront has also previously stated that the "Business Name" of its operator was "Kil Sun Choe" and "KSJ LLC."  Through investigation, AdvoCare discovered that there is a limited liability company organized under Washington law called KSJ LLC, although the limited liability was administratively dissolved on or around June 3, 2022. Corporate documents that were filed for KSJ LLC identified Kil Choe as a governor of KSJ LLC.

97.    The "forestNstreet" Amazon storefront has stated that the "Business Name" of the operator of the storefront is "Freedom Society Inc."  Through investigation, AdvoCare discovered that there is a corporation organized under Oregon law called Freedom Society Inc., although the corporation was administratively dissolved on or around October 13, 2022.  Corporate documents

that were filed for Freedom Society Inc. identified Benjamin Kim as the president and secretary of Freedom Society Inc., did not identify any other individuals as officers of Freedom Society Inc., and provided that the mailing address and principal place of business of Freedom Society Inc. was 1990 Table Rock Road, Unit D, Medford, OR 97501 (the "Table Rock Road Address").  The Table Rock Road Address has also been listed on the "forestNstreet" Amazon storefront as the "Business Address" of the storefront.

98.    The "forestNstreet" Amazon storefront has also previously stated that the "Business Name" of its operator was "Clean & Meek Corporation."  Through investigation, AdvoCare discovered that there is a corporation organized under Oregon law called Clean & Meek Corporation, although the corporation was administratively dissolved on or around August 19, 2021.  Corporate documents that were filed for Clean & Meek Corporation identified Ian Kim as the president and secretary of Clean & Meek Corporation and listed Ian Kim's home address— 4405 Vista Pointe Drive, Medford, OR 97504—as the mailing address and principal place of business of Clean & Meek Corporation.

99.    A product purchase from the "forestNstreet" storefront in 2020 also resulted in a product being shipped that listed "InG Kim" on the return address label.  Upon information and belief, and based on the return address information that appeared on the address label, the "InG Kim" who shipped the product was Ian Kim.

100.    The "COSMOLINK^^" Amazon storefront has stated that the "Business Name" of the operator of the storefront is "Glow Together, LLC."  Through investigation, AdvoCare discovered that there is a limited liability company organized under Washington law called Glow Together, LLC, although the limited liability company was administratively dissolved on or around May 3, 2021.  Corporate documents that were filed for Glow Together, LLC identified

Eunseok Kim as the sole governor of Glow Together, LLC, did not identify any other individuals as officers or members of Glow Together, LLC, and stated that the physical address of Glow Together, LLC was 11700 Mukilteo Speedway, Ste. 201-1046, Mukilteo, WA 98275 97501 (the "Mukilteo Speedway Suite 201 Address"). The Mukilteo Speedway Suite 201 Address has also been listed on the "COSMOLINK^^" Amazon storefront as the "Business Address" of the storefront.

101.     Through investigation of the Individual Defendants, AdvoCare has discovered that: (1) virtually every Individual Defendant used to be an AdvoCare Independent Distributor; (2) the remaining Individual Defendants purchased AdvoCare products from the Individual Defendants when they were Distributors or have addresses and other contact information that is connected to or overlaps with information from the Individual Defendants' Distributor accounts; and (3) according to public records databases and other investigation, all of the Individual Defendants appear to be relatives and/or friends who have overlapping and shared addresses and acquaintances.

102.     After AdvoCare discovered that the Individual Defendants were working in concert to sell products bearing AdvoCare's trademarks on Amazon, AdvoCare investigated and terminated all Distributor accounts that were opened in the names of Individual Defendants or that used the Individual Defendants' known contact information. Through this investigation, AdvoCare discovered that the Individual Defendants had opened numerous duplicative accounts that used slight variations in their names and contact information to conceal their identities. AdvoCare also discovered that the Individual Defendants may have opened accounts in the names of other individuals without those individuals' knowledge or permission.

103.    Through its investigation, AdvoCare also discovered that the Individual Defendants' Distributor accounts were structured so that one or more Individual Defendants earned bonuses and commissions when other Individual Defendants purchased products. AdvoCare no longer provides bonuses and commissions to Distributors based on purchases made by other Distributors, but such bonuses and commissions were provided at the time that some of the accounts were opened.  The Individual Defendants' accounts were all set up so that bonuses and commissions were paid to an account opened by Young Lee when other Individual Defendants purchased products that were ultimately sold on Amazon.  Based on this structuring and other information AdvoCare discovered in investigating the Individual Defendants, AdvoCare believes that Young Lee is the primary ringleader of Defendants' scheme.

104.    Despite AdvoCare's termination of the Individual Defendants' Distributor accounts, the Individual Defendants have continued to acquire and resell products bearing the AdvoCare Trademarks through their Amazon Storefronts.

105.    As discussed above, all of the Entity Defendants are controlled by one or more of the Individual Defendants and appear to have been created solely so the Individual Defendants can conceal their identities by listing the entities on Amazon storefronts the Individual Defendants use to sell products.  All the addresses that are listed on corporate documents filed for the Entity Defendants are private mailboxes or other addresses that appear to be residential addresses rather than any place of business.  Upon information and belief, all of the Entity Defendants are sham companies that have no employees and do not follow any corporate formalities.

106.    For all of these reasons and based on its investigation, AdvoCares believes that Young Lee, Young Park, Lauren Kim, Mia Kim, Ian Kim, Kuk Kang, Nosoon Kook, Jin Hwang, Jin Lee, Tae Lee, Do Lee, Christi Kang, Kil Choe, Mi Lee, Kwang Lee, Benjamin Kim, Eunseok

Kim, Trade Value Corporation, Everdeals Inc, Bloomingle Co., Dorothy Lee Inc., One Etrade Plug Inc, and Edays, LLC have all acted in concert to sell infringing products bearing the AdvoCare Trademarks through each of the Amazon Storefronts and are jointly responsible for the conduct complained of herein.

107.    AdvoCare has sent numerous cease-and-desist letters to each Defendant and all of the addresses that have been listed on the Defendants' Amazon storefronts.  AdvoCare's letters have explained that Defendants are infringing the AdvoCare Trademarks by selling products through the Amazon Storefronts that are materially different from products sold with AdvoCare's authorization and which are not subject to, do not abide by, and interfere with AdvoCare's quality controls.   The letters have also explained that Defendants are tortiously interfering with AdvoCare's contracts by purchasing products from Distributors, who are prohibited from selling products to persons or entities that resell the products, and some of AdvoCare's letters enclosed draft complaints against Defendants that were prepared for filing in the United States District Court for the Eastern District of Texas.  AdvoCare's letters demanded that Defendants permanently cease selling products bearing the AdvoCare Trademarks and disclose every person and entity that provided Defendants with the products they have sold.

108.    As of the time of filing, not a single Defendant has responded to any of AdvoCare's cease-and-desist letters or otherwise contacted AdvoCare to deny their sales or involvement in the foregoing scheme, as one would expect if AdvoCare had improperly accused any of the Defendants.

109.    Defendants' disregard of AdvoCare's cease-and-desist letter and continued sales of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

110.    Defendants have sold—and are continuing to sell—a very high volume of infringing products bearing the AdvoCare Trademarks through their Amazon Storefronts. Monitoring software estimates that Defendants have sold more than 39,000 infringing products through their Amazon Storefronts for revenue in excess of $1,800,000.

111.    Upon information and belief, through their storefronts on the highly interactive Amazon website, Defendants accept and fulfill orders from Texas residents for products bearing the AdvoCare Trademarks and cause substantial quantities of infringing products bearing the AdvoCare Trademarks to be shipped to persons located in Texas through the regular course of business.

112.    As of the time of filing, Defendants' Amazon Storefronts are called "Dreamtrade," "HeGrace," "Good Products One," "everdeals4u," "Illuminate," "Best4living," "BLUEJAY05," "Progressive Fresh Health," "Green365," "forestNstreet," and "COSMOLINK^^".  However, Amazon allows storefront operators to change the names of their storefronts and some of Defendants' Amazon Storefronts have had different names in the past before Defendants changed the names to their present names.  For example, Defendants' "Good Products One" storefront was previously called "Store for Gentleness" but Defendants changed the storefront name to "Good Products One" shortly before the time of filing.

113.    Although operators of third-party storefronts on Amazon are able to change the names of their online storefronts, every storefront on Amazon is assigned a "Merchant ID number" that does not change over time even if the formal "name" of a storefront is changed.  The Merchant ID numbers for Defendants' Amazon Storefronts are, respectively, A1MWYO9R0WSUHA, A163468CCGF0Q7,    AYIU3P171RV6J,    A1FQ9UABKHYZFT,    A2R53PFK6NAZOM, A2UWD6WE15R4LW,  A1I77UV73TUUTJ,  A3QONIZYSPHDTV,  A1NTXYEZNYX0W3,

A3DNZ7AVGC8D8Z, and A3AH2KP6DTFC7G.  Even if Defendants change the name of one or more of their Amazon Storefronts in the future, their storefronts can always be accessed at the following links that include the storefronts' Merchant ID numbers and will always direct to the Defendants' Amazon Storefronts even if their "names" are changed:

    a.  https://www.amazon.com//sp?seller=A1MWYO9R0WSUHA (currently called "Dreamtrade")

    b.  https://www.amazon.com//sp?seller=A163468CCGF0Q7 (currently called "HeGrace")

    c.  https://www.amazon.com//sp?seller=AYIU3P171RV6J (currently called "Good Products One")

    d.  https://www.amazon.com//sp?seller=A1FQ9UABKHYZFT (currently called "everdeals4u")

    e.  https://www.amazon.com//sp?seller=A2R53PFK6NAZOM (currently called "Illuminate")

    f.  https://www.amazon.com//sp?seller=A2UWD6WE15R4LW (currently called "Best4living")

    g.  https://www.amazon.com//sp?seller=A1I77UV73TUUTJ (currently called "BLUEJAY05")

    h.  https://www.amazon.com//sp?seller=A3QONIZYSPHDTV (currently called "Progressive Fresh Health")

    i.  https://www.amazon.com//sp?seller=A1NTXYEZNYX0W3 (currently called "Green365")

j.  https://www.amazon.com//sp?seller=A3DNZ7AVGC8D8Z (currently called "forestNstreet")

k.  https://www.amazon.com//sp?seller=A3AH2KP6DTFC7G (currently called "COSMOLINK^^")

114.    Discovery may reveal that additional individuals and/or entities have also acted in concert with Defendants to unlawfully sell products bearing the AdvoCare Trademarks. Defendants' scheme is widespread and involves many individuals who have taken numerous measures to conceal their identities and involvement, including by providing fake or incomplete information to AdvoCare.  AdvoCare records also show that some Distributor accounts, despite not being opened in the name of any Defendant, have purchased products from AdvoCare and directed that the products be shipped to addresses that are connected to one or more of Defendants. If discovery reveals that other individuals or entities have acted in concert with Defendants and participated in Defendants' scheme, AdvoCare will file an amended complaint that adds those parties as defendants.

**Defendants Are Infringing the AdvoCare Trademarks by Selling Products Bearing the AdvoCare Trademarks That Are Not Subject To, Do Not Abide By, and Interfere With AdvoCare's Quality Control and Customer Service Requirements**

115.    Defendants, without authorization from AdvoCare, have sold—and continue to sell—an extremely high volume of products bearing the AdvoCare Trademarks through their Amazon Storefronts.  Defendants may also be selling products through additional channels that AdvoCare has not yet discovered, and cannot discover until it is able to take discovery.

116.    AdvoCare has implemented quality control and customer service requirements throughout its authorized channels of distribution.  The products sold by Defendants are not

genuine AdvoCare products because they are not subject to, and interfere with, AdvoCare's quality control and customer service requirements.

117.    AdvoCare's quality control and customer service requirements are legitimate and substantial.  As a result of Defendants' sales of products that are not subject to these requirements, AdvoCare has lost control of the quality of goods that bear its trademarks.  For example, AdvoCare has no control over whether Defendants: (i) carry out the product inspection, storage, and handling requirements that Distributors are required to follow; or (ii) sell products that are counterfeit, damaged, defective, previously used, tampered with, repackaged, or otherwise altered.

118.    Defendants are also interfering with AdvoCare's quality control and customer service requirements, among other ways, because AdvoCare cannot take any corrective action if Defendants sell poor quality products or otherwise fail to abide by AdvoCare's quality control and customer service requirements.  Defendants also do not provide personal services to consumers that Distributors are required to provide—and are not capable of providing such services—including providing advice, answering questions, and teaching customers how to safely use AdvoCare products because, as non-Distributors, Defendants do not have access to the approved literature and other educational materials that Distributors are given to perform these services.

119.    Customers have written numerous negative reviews of Defendants' Amazon Storefronts in which they complained of receiving products—including products bearing the AdvoCare Trademarks—that were damaged, tampered with, unsealed, previously used, missing contents, near expiration, allegedly counterfeit, or otherwise different from what customers had ordered.  Although Amazon has added comments to some of these complaints stating that Amazon takes "responsibility" for the "fulfillment experiences" described in the complaints, the problems that customers address in these reviews are clearly the fault of Defendants rather than a fulfillment

problem, such as delivering a product to the wrong address, that could be attributable to Amazon rather than Defendants:

 "There is zero color in this item. I'm not sure if it's a knock off or what. It definitely doesn't have all the beautiful colors that the stock photos it says it has. The only color this has is like a blah beige... I'm disappointed, it was a gift I can't return it, this sucks."
Read less

By Caprice Wilson on March 22, 2023.

 "The packaging was badly damaged. Intended to give as a gift and had to remove from the box before putting in gift bag."

By Ithca Evans on February 10, 2023.

 "My bottle cane with the bottom broken off. What was strange was the broken part was not in the package. I did not feel safe using the product. Could you send a replacement? Thank you!"
Read less

By ann smith on August 1, 2022.

 "~~The item arrived open and busted. The powder was everywhere~~"

By rachael hayes on July 23, 2022.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

 "The ad stated pack of 12. I received only one container. Are the rest coming? Or should I just send this back as a false advertisement. I purchased before and did receive the 12 so what has changed."
Read less

By Amazon Customer on July 4, 2022.

 "I ordered pink lemonade spark. The image is for limeade and I got strawberry mango (my least favorite flavor)😊"

By Dele Downs Kooley on October 30, 2020.

★☆☆☆☆    "The saler deleted my first feedback . I got completely differ product."

By CW on October 17, 2020.

★☆☆☆☆ "~~Listing was for a Canister and the seller ships powder packets with an expiration date of less than 1 year. Be ware, you will not get what you order~~"

By Steve Humphrey on October 12, 2020.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆    "The package was not sealed. One item was missing!!!!"

By Patricia W. on July 28, 2020.

> ★★☆☆☆   "I received this today but the bottle leaked and there was only 3/4 liquid in the bottle! Upset!"
>
> By Carol Ohmura on May 28, 2019.
>
> **Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

120.    These reviews are only a sample of the negative reviews that customers have written about Defendants and their Amazon Storefronts, and they are typical of the complaints made about the products sold and the customer service provided by unauthorized sellers on online marketplaces.  AdvoCare allows its products to be sold only by sellers who are subject to its quality controls and prohibits Distributors from selling products on online marketplaces to prevent customers from suffering experiences like those described in the above complaints about Defendants.

121.    The negative reviews of Defendants' Amazon Storefronts show that Defendants are providing poor customer service and selling numerous products—including products bearing the AdvoCare Trademarks—that are damaged, tampered with, unsealed, previously used, missing contents, and expired or near expiration.   Given the high number of customers who have complained about the quality of products they purchased from Defendants, it is also very likely that Defendants are responsible for some of the negative reviews of AdvoCare products that Defendants have sold through their Amazon Storefronts in which consumers have complained of the same problems.  *See supra* ¶¶ 64-69.  For all of these reasons, the products being sold by Defendants are also not genuine AdvoCare products because they do not abide by the quality control and customer service requirements that AdvoCare exercises over its products.

122.    Through their unauthorized use of the AdvoCare Trademarks, Defendants have misled—and continue to mislead—consumers into believing they are purchasing products with the same quality controls as genuine AdvoCare products.  In reality, however, the products sold by Defendants are materially different from genuine AdvoCare products because they are not subject

to, do not abide by, and interfere with AdvoCare's quality control and customer service requirements.

**Defendants Are Infringing the AdvoCare Trademarks by Selling**
**Products Bearing The AdvoCare Trademarks That**
**Do Not Come With the AdvoCare Satisfaction Guarantee**

123.    As set forth above, AdvoCare products purchased from AdvoCare or Distributors come with the AdvoCare Satisfaction Guarantee.  However, AdvoCare does not provide the Satisfaction Guarantee for products purchased from any third party who is not an authorized seller because AdvoCare cannot ensure the quality of products sold by sellers that are not subject to its quality controls.

124.    Because Defendants are not Distributors and are thus not subject to AdvoCare's quality control requirements, the products bearing the AdvoCare Trademarks that they sell do not come with the Satisfaction Guarantee.

125.    Because the products Defendants sell do not come with the Satisfaction Guarantee, they are materially different from genuine AdvoCare products.

126.    The Satisfaction Guarantee is a material element of genuine AdvoCare products. Consumers considering whether to purchase AdvoCare products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Satisfaction Guarantee.  Consumers who purchase AdvoCare products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high-quality product, that AdvoCare stands behind the product, and that they can get a refund or product exchange if they are dissatisfied with their product for any reason.

127.    Defendants' unauthorized sale of products bearing the AdvoCare Trademarks is likely to, and does, create customer confusion because customers who purchase products from

Defendants believe they are purchasing genuine AdvoCare products that come with the Satisfaction Guarantee when, in fact, they are not.

### Defendants Are Tortiously Interfering With AdvoCare's Contracts With Distributors

128.    As discussed, AdvoCare allows AdvoCare products to be sold to end-user consumers only by itself and by sellers it expressly authorizes to sell AdvoCare products.

129.    AdvoCare has entered into contracts with all of its Distributors that prohibit Distributors from selling AdvoCare products to persons or entities that Distributors know, or reasonably should know, are going to resell the products. Distributors are permitted to sell products only to end-user consumers.

130.    Defendants have sold and are continuing to sell an extremely high volume of products bearing the AdvoCare Trademarks. Although Defendants likely obtained some of the products they have resold from AdvoCare through now-terminated Distributor accounts, Defendants' Amazon Storefronts have sold an extremely high volume of products that exceeds the quantity of products that Defendants could have obtained from AdvoCare. Accordingly, upon information and belief, Defendants have purchased at least some of the products they have resold from Distributors.

131.    By purchasing AdvoCare products from Distributors and then reselling them on the Internet, Defendants caused and induced Distributors to breach their contracts with AdvoCare.

132.    Defendants have known that AdvoCare's contracts with Distributors prohibit Distributors from selling AdvoCare products to third parties, such as Defendants, who are not ultimate consumers and who resell the products.

133.    Defendants have known of this prohibition, among other reasons, because AdvoCare has informed Defendants of this prohibition in numerous cease-and-desist letters it has

sent to Defendants. Defendants also separately knew of this prohibition before receiving AdvoCare's letter because most Defendants used to be Distributors and they knew through their business relationship that Distributors are prohibited from selling to third parties who resell the products.

134.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with AdvoCare's contracts with its Distributors by actively seeking out Distributors and then encouraging, cajoling, and pressuring Distributors to breach their contracts by selling products to Defendants that Defendants resold on the Internet.

135.    Defendants had no legal right, privilege, or justification for their conduct. Defendants purchased AdvoCare products from Distributors—and in so doing, instigated a breach of the Distributors' contracts with AdvoCare—so that Defendants could resell the products as non-Distributors who are not subject to and do not abide by AdvoCare's quality controls, thereby unlawfully infringing upon and materially damaging the value of the AdvoCare Trademarks.

**AdvoCare Has Suffered Substantial Harm as a Result of Defendants' Conduct**

136.    As a proximate result of Defendants' actions, AdvoCare has suffered, and will continue to suffer, significant monetary harm including, but not limited to, loss of sales, damage to the value of its intellectual property, harm to the goodwill associated with the AdvoCare brand, and damage to its existing and potential business relations. The injury to AdvoCare is immediate and irreparable, as AdvoCare's reputation and relationships have been damaged among both Distributors and consumers.

137.    Defendants' conduct was and is knowing, intentional, willful, malicious, wanton, and contrary to law.

138.    AdvoCare is entitled to injunctive relief because Defendants will otherwise continue to unlawfully sell products bearing the AdvoCare Trademarks that are materially different from genuine AdvoCare products and are not subject to, interfere with, and do not abide by AdvoCare's quality controls, thereby compromising AdvoCare's quality controls.  Defendants' ongoing illegal conduct has caused and will continue to cause irreparable harm to AdvoCare's reputation, goodwill, business relationships, intellectual property, and brand integrity.

### FIRST CAUSE OF ACTION
**Trademark Infringement**
**15 U.S.C. §§ 1114 and 1125(a)**

139.    AdvoCare re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

140.    AdvoCare owns the AdvoCare Trademarks.

141.    AdvoCare has registered the AdvoCare Trademarks with the United States Patent and Trademark Office.

142.    The AdvoCare Trademarks are valid and subsisting trademarks in full force and effect.

143.    Defendants have willfully and knowingly used, and continue to use, the AdvoCare Trademarks in interstate commerce for the purpose of selling products bearing the AdvoCare Trademarks without AdvoCare's consent.

144.    The products bearing the AdvoCare Trademarks that Defendants sell are not authorized for sale by AdvoCare.

145.    Defendants' use of the AdvoCare Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine

products legitimately bearing the AdvoCare Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with AdvoCare when they are not.

146.    Defendants' use of the AdvoCare Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine AdvoCare products.

147.    The products sold by Defendants are not, in fact, genuine AdvoCare products.  The products sold by Defendants are materially different from genuine AdvoCare products because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with AdvoCare's quality control requirements.

148.    Defendants' unauthorized use of the AdvoCare Trademarks has materially damaged the value of the AdvoCare Trademarks, caused significant damage to AdvoCare's business relations, and infringed on the AdvoCare Trademarks.

149.    As a proximate result of Defendants' actions, AdvoCare has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.  The injury to AdvoCare is immediate and irreparable, as AdvoCare's reputation and relationships have been damaged among both Distributors and consumers.

150.    AdvoCare is entitled to recover its damages caused by Defendants' infringement of the AdvoCare Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

151.    AdvoCare is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and, unless Defendants are permanently enjoined, AdvoCare will suffer irreparable harm.

152.    AdvoCare is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117 because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the AdvoCare Trademarks.

**SECOND CAUSE OF ACTION**
**Unfair Competition**
**15 U.S.C. § 1125(a)(1)(A)**

153.    AdvoCare re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

154.    AdvoCare owns the AdvoCare Trademarks.

155.    AdvoCare has registered the AdvoCare Trademarks with the United States Patent and Trademark Office.

156.    The AdvoCare Trademarks are valid and subsisting trademarks in full force and effect.

157.    Defendants have willfully and knowingly used, and continue to use, the AdvoCare Trademarks in interstate commerce for the purpose of selling products bearing the AdvoCare Trademarks without AdvoCare's consent.

158.    The products bearing the AdvoCare Trademarks that Defendants sell are not authorized for sale by AdvoCare.

159.    Defendants' use of the AdvoCare Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the AdvoCare Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with AdvoCare when they are not.

160.    Defendants' use of the AdvoCare Trademarks in connection with their sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic AdvoCare products when they are not.

161.    Defendants' unauthorized sale of products bearing the AdvoCare Trademarks and unauthorized use of the AdvoCare Trademarks in advertising infringes on the AdvoCare Trademarks.

162.    Defendants' unauthorized sale of products bearing the AdvoCare Trademarks and unauthorized use of the AdvoCare Trademarks in advertising has materially damaged the value of the AdvoCare Trademarks and has caused significant damages to AdvoCare's business relations.

163.    As a proximate result of Defendants' actions, AdvoCare has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.  The injury to AdvoCare is immediate and irreparable, as AdvoCare's reputation and relationships have been damaged among both Distributors and consumers.

164.    AdvoCare is entitled to recover its damages caused by Defendants' unfair competition and disgorge Defendants' profits from their unlawful sales and unjust enrichment.

165.    AdvoCare is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, AdvoCare will suffer irreparable harm.

166.    AdvoCare is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117 because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition.

## THIRD CAUSE OF ACTION
**Texas Common Law Trademark Infringement and Unfair Competition**

167.    AdvoCare re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

168.    This claim arises under the common law of the State of Texas.

169.    AdvoCare owns the AdvoCare Trademarks.

170.    AdvoCare has registered the AdvoCare Trademarks with the United States Patent and Trademark Office.

171.    The AdvoCare Trademarks are valid and subsisting trademarks in full force and effect.

172.    Defendants have willfully and knowingly used, and continue to use, the AdvoCare Trademarks in interstate commerce for the purpose of selling products bearing the AdvoCare Trademarks without AdvoCare's consent.

173.    The products bearing the AdvoCare Trademarks that Defendants sell are not authorized for sale by AdvoCare.

174.    Defendants' use of the AdvoCare Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the AdvoCare Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with AdvoCare when they are not.

175.    Defendants' use of the AdvoCare Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine AdvoCare products.

176.   The products sold by Defendants are not, in fact, genuine AdvoCare products.  The products sold by Defendants are materially different from genuine AdvoCare products because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with AdvoCare's quality control requirements.

177.   Defendants' unauthorized use of the AdvoCare Trademarks has materially damaged the value of the AdvoCare Trademarks, caused significant damage to AdvoCare's business relations, and infringed on the AdvoCare Trademarks.

178.   As a proximate result of Defendants' actions, AdvoCare has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.  The injury to AdvoCare is immediate and irreparable, as AdvoCare's reputation and relationships have been damaged among both Distributors and consumers.

179.   AdvoCare is entitled to recover its damages caused by Defendants' unfair competition and infringement of the AdvoCare Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

180.   In harming AdvoCare, Defendants have acted with willful misconduct and actual malice.  Accordingly, AdvoCare is entitled to an award of punitive damages.

### FOURTH CAUSE OF ACTION
**Tortious Interference with Existing Contracts and Business Relationships**

181.   AdvoCare re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

182.   This claim arises under the common law of the State of Texas.

183.   AdvoCare allows AdvoCare products to be sold to end-user consumers only by itself and by sellers it expressly authorizes to sell AdvoCare products.

184.    AdvoCare has entered into contracts with all of its Distributors that prohibit Distributors from selling AdvoCare products to persons or entities that Distributors know, or reasonably should know, are going to resell the products.  Distributors are permitted to sell products only to end-user consumers.

185.    Defendants have sold and are continuing to sell an extremely high volume of products bearing the AdvoCare Trademarks.  Although Defendants likely obtained some of the products they have resold from AdvoCare through now-terminated Distributor accounts, Defendants' Amazon Storefronts have sold an extremely high volume of products that exceeds the quantity of products that Defendants could have obtained from AdvoCare.  Accordingly, upon information and belief, Defendants have purchased at least some of the products they have resold from Distributors.

186.    By purchasing AdvoCare products from Distributors and then reselling them on the Internet, Defendants caused and induced Distributors to breach their contracts with AdvoCare.

187.    Defendants have known that AdvoCare's contracts with Distributors prohibit Distributors from selling AdvoCare products to third parties, such as Defendants, who are not ultimate consumers and who resell the products.

188.    Defendants have known of this prohibition, among other reasons, because AdvoCare has informed Defendants of this prohibition in numerous cease-and-desist letters it has sent to Defendants.  Defendants also separately knew of this prohibition before receiving AdvoCare's letter because most Defendants used to be Distributors and they knew through their business relationship that Distributors are prohibited from selling to third parties who resell the products.

189.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with AdvoCare's contracts with its Distributors by actively seeking out Distributors and then encouraging, cajoling, and pressuring Distributors to breach their contracts by selling products to Defendants that Defendants resold on the Internet.

190.    Defendants had no legal right, privilege, or justification for their conduct. Defendants purchased AdvoCare products from Distributors—and in so doing, instigated a breach of the Distributors' contracts with AdvoCare—so that Defendants could resell the products as non-Distributors who are not subject to and do abide by AdvoCare's quality controls, thereby unlawfully infringing upon and materially damaging the value of the AdvoCare Trademarks.

191.    AdvoCare's contracts with its Distributors are a specific class of contract that Defendants are causing Distributors to breach when they purchase products from Distributors for resale.  Although AdvoCare does not yet know which specific Distributor(s) have breached their contracts with AdvoCare—and indeed cannot learn that information with certainty until it is able to take discovery from Defendants in this action—Defendants know from whom they obtained the products they have resold and are on notice of the basis for AdvoCare's claim of tortious interference.

192.    Defendants are not parties to the contracts they caused Distributors to breach.

193.    As a proximate result of Defendants' actions, AdvoCare has suffered, and will continue to suffer, great damage to its business, sales, goodwill, reputation, and its existing business relations.  The injury to AdvoCare is immediate and irreparable, as AdvoCare's reputation and relationships have been damaged among both Distributors and consumers.

194.    In interfering with AdvoCare's existing contracts and business relationships with its Distributors, Defendants have acted with willful misconduct and actual malice.  Accordingly, AdvoCare is entitled to an award of punitive damages.

## CONDITIONS PRECEDENT

195.    All conditions precedent to AdvoCare's claims for relief, if any, have occurred or have been performed.

## TOLLING OF STATUTE OF LIMITATIONS

196.    The statute of limitations is tolled by one or more of the following doctrines: continuing tort doctrine, discovery rule, fraudulent concealment.

## REQUEST FOR ATTORNEYS' FEES

197.    AdvoCare is entitled to recover its attorneys' fees and costs for this action, pursuant to the federal and state law identified herein, and AdvoCare hereby seeks such recovery from Defendants of all its reasonable and necessary attorneys' fees and costs for prosecuting this action and obtaining the relief requested herein.

## JURY DEMAND

198.    AdvoCare demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, AdvoCare prays for relief and judgment as follows:

A.    Judgment in favor of AdvoCare and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, disgorgement of profits, punitive damages, exemplary damages, and pre-judgment and post-judgment interest as permitted by law;

B.    That preliminary and permanent injunctions be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i)    Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all AdvoCare products,

ii)    Prohibiting the Enjoined Parties from using any of the AdvoCare Trademarks in any manner, including advertising on the Internet,

iii)    Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all AdvoCare products as well as any products bearing any of the AdvoCare Trademarks,

iv)    Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the AdvoCare Trademarks including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks,

v)    Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of AdvoCare's products, or any of the AdvoCare Trademarks,

vi)    Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any of the AdvoCare Trademarks which associate AdvoCare's products or the AdvoCare Trademarks with the Enjoined Parties or the Enjoined Parties' websites,

vii)    Requiring the Enjoined Parties to take all action to remove the AdvoCare Trademarks from the Internet, including from the website www.amazon.com; and

viii)    Requiring Defendants to destroy or return to AdvoCare all products bearing the AdvoCare Trademarks in Defendants' possession, custody, or control.

C.    An award of attorneys' fees, costs, and expenses; and

D.      Such other and further relief as the Court deems just, equitable and proper.

Respectfully submitted,

*/s/ Paul T. Elkins*
Bryan J. Wick
Texas State Bar No. 24003169
bryan.wick@wickphillips.com
Paul T. Elkins
Texas State Bar No. 24092383
paul.elkins@wickphillips.com

**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Facsimile: (214) 692-6255

Kent A. Britt (admitted E.D. Texas)
Ohio State Bar No. 0068182
kabritt@vorys.com
Daniel C.F. Wucherer (*pro hac*)
Ohio State Bar No. 0097210
dcwucherer@vorys.com

**VORYS, SATER, SEYMOUR AND PEASE LLP**
301 E. 4th St, Suite 3500
Cincinnati, OH 45202
Telephone: (513) 723-4000
Facsimile: (513) 723-4056

*Attorneys for Plaintiffs AdvoCare International,*
*LLC and CERPUR Pioneer, LLC*